## ROBINSON *v.* SUTTER.*

### (*Circuit Court, N. D. Illinois.* 1881.)

1. PATENT No. 216,293—APPARATUS FOR RESWEATING TOBACCO—NOVELTY—VA-LIDITY—INFRINGEMENT.

    Letters patent No. 216,293, granted June 10, 1879, to Abraham Robinson, for apparatus for resweating tobacco, *held, not void for want of novelty* by reason of letters patent No. 152,004, granted June 16, 1874, to Edmund J. Oppelt, for apparatus for coloring tobacco leaves, and letters patent No. 206,156, granted July 16, 1878, to Ernst Wenderoth, for process and apparatus for coloring tobacco leaves, *held,* also, to be *valid,* and *infringed.*

2. SAME—SAME—"TIGHT" CONSTRUED.

    The term "tight," used in complainant's claim to qualify the construction of the inner chamber or tobacco holder, construed to mean sufficiently tight to subserve the purposes of the invention. Slight crevices or openings, arising from defective mechanical construction, if not large enough to admit steam in such quantity or volume as to wet the tobacco and defeat the operation of the apparatus, will not violate such rule of construction, nor relieve such apparatus from the charge of infringement.

3. SAME—SAME—OPPELT AND WENDEROTH DEVICES—NOVELTY—INFRINGEMENT.

    Complainant's invention, consisting of an apparatus for resweating tobacco by packing the leaves closely in a wooden box or tub, made substantially tight, except so far as the pores of the wood permit vapor or moisture to slowly percolate through the wood and diffuse itself with the mass of leaves, from a body of warm water and expanded steam contained in an outer tank or chamber surrounding such box, the heat being supplied by an external generator, *held, not invalidated, for want of novelty,* by the prior Oppelt and Wenderoth devices, consisting of metallic tanks and metallic tobacco holders within them, into which steam is directly admitted, by which the tobacco becomes wet, and, to a limited extent, cooked; and *infringed* by defendant's device, having a similar outer tank, supplied with water heated by a similar external generator, but no specific, permanent inner chamber or tobacco holder, sufficiently tight to exclude moisture except through its pores; but using instead thereof the original case in which the leaf tobacco comes packed.

*Munday, Evarts & Adcock,* for complainant.

*Banning & Banning* and *Adolph Moses,* for defendant.

BLODGETT, D. J. This is a suit for infringement of letters patent granted by the United States to complainant, Abraham Robinson, on the tenth of June, 1879, for an improved apparatus for resweating tobacco. The defence set up is—*First,* that defendant does not infringe complainant's patent; *second,* that complainant's patent is void for want of novelty. It seems from the proof that, in the manipulation of tobacco, it is deemed very desirable to obtain a dark uniform color in the leaf, especially of that to be used for cigar wrappers; that in the natural sweating which the leaf undergoes in the ordinary process of curing, it is left spotted, or some leaves will be

* Reversed. See 7 Sup. Ct. Rep. 376.

darker than others, and the process of resweating is intended to bring the tobacco to a dark and uniform color.

Robinson claims to have discovered that tobacco can be successfully resweated by packing the leaves closely in a mass in a wooden box or tub made substantially tight, except so far as the pores of the wood will admit vapor or moisture to slowly percolate through the wood and diffuse itself with the mass of leaf, from a body of warm water and expanded steam contained in an outer tank or chamber surrounding the tobacco holder; the process to continue from three to eight days, according to the mass of tobacco to be operated upon. The apparatus which he devised for this purpose, and which is covered by his patent, consists—

*First*, of a tank, or chamber, adapted to hold a body of water, and sufficiently tight to hold expanded steam, or steam generated or let into the chamber at a very low pressure.

The model presented here consists of a tank which is water-tight at the bottom, and substantially water or steam-tight above, with the tobacco holder let into it, and suspended by a rim upon the edge, the holder being made tight as described; but the patentee does not restrict himself to this precise form of construction.

*Second.* A tobacco holder in which the mass of leaf tobacco is placed, which tobacco holder is placed or suspended inside of the tank or chamber.

*Third.* A steam generator for producing steam, by which the water in the chamber is to be warmed, and steam generated, whereby a warm, humid atmosphere is kept constantly about the tobacco holder, and the warm moisture gradually diffused through the tobacco in the holder.

The size and capacity of the apparatus is wholly within the control of the operator. It is obvious that the water-tank or chamber must be, for practical purposes, large enough to contain the tobacco holder, and give a space underneath the holder for water, and a space above the water and around the holder for steam to diffuse itself, so as to wrap the tobacco holder in the wet steam or moisture; that is to say, the tank must be large enough to contain the tobacco holder, giving a water space underneath, and space about the tobacco holder around which steam can be circulated. The tobacco holder is made comparatively tight, so as to prevent the steam from coming in direct contact with the tobacco, but enough moisture is found to be admitted through the pores of the wood, in connection with the warmth, to secure the process of resweating. The heater or steam generator is placed outside the chamber, and its only function is to supply the

necessary heat, which may be done by passing steam into the water only, or steam may be let into the chamber above the water if desired.

The device used by defendant operates upon precisely the same principle as that of complainant; that is, it has a tank or chamber within which the tobacco holder is placed. The bottom of the tank is supplied with water, which is heated by an outside steam generator or heater; and the only difference between the two devices of the complainant and defendant is that the defendant's tobacco holder is not made tight so as to exclude moisture, except through the pores of the wood, the defendant in practice using the ordinary tobacco cases, in which the leaf tobacco comes packed, to hold their tobacco during their process of resweating. In other words, the defendant opens the doors in his tank, and slides the ordinary tobacco case, full of tobacco, into this steam box, and allows it to remain there until the tobacco has become resweated, which is in no respect different from the process of Robinson, except as hereinafter noted. But it is claimed that this is a substantial difference, because it is insisted that complainant's claim requires his tobacco holder to be tight, while the defendant's tobacco holders are not tight.

I think, however, the word "tight," as used in his claim, is to be construed, in the light of his specifications, as meaning sufficiently tight to subserve the purposes to be accomplished. The term, as used here, must be held, I think, to mean comparatively or approximately tight; close enough to exclude an excess of steam or moisture, and open or porous enough to allow the warm moisture to sweat or percolate into the tobacco-holder, so as to warm and moisten its contents; and it would seem that slight crevices or openings arising from defective mechanical construction, if not large enough to admit steam in such quantity or volume as to wet the tobacco, would not violate this patentee's rule of construction.

The patentee, as I have already said, describes in his specifications the kind of tank he requires for his process. He says:

"It is usual to soften the leaves of tobacco, as is well known, in order to prepare them for being manufactured into cigars and other manufactured goods, and to bring out a good and uniform color. This has been done heretofore in various ways, and, among others, by dampening the leaves and exposing them to heat while in that condition. The object of this invention is to provide improved means of exposing the leaves to the action of steam for the purposes above set forth; and to that end my invention consists of a tobacco-holding vessel, made of wood, sufficiently porous to permit the steam

to percolate through it, in combination, substantially, as hereinafter described, with a steam-generating apparatus, and a steam-receiving chamber surrounding the vessel for containing the tobacco.

"I am aware that the general structural plan of the apparatus hereinafter described is old, and I do not, therefore, here intend to claim the same independently of a tobacco-receiving vessel made of wood sufficiently porous to permit the steam to percolate through it, as and for the purposes set forth, the said wooden vessel constituting, as I believe, an improvement upon the apparatus heretofore in use, for the reason that, in employing wood instead of metal in the construction of the said vessel, the tobacco is prevented from being tainted, and may be kept continually moist by the action of the steam, instead of being merely heated and sweated by it, or steamed only by the generation of steam in the same vessel containing the tobacco; it being obvious that, if the tobacco-receiving vessel be made of metal, as heretofore in devices of this class, the steam in the outer surrounding vessel would merely heat the tobacco, and sweat it, without imparting new moisture to it. Neither do I here intend to claim the process, as such, of steaming tobacco. * * *

"C is a tight wooden vessel for receiving the tobacco to be treated. This vessel should be provided with a tight-fitting cover, a. I make the vessel, C, of wood, as an essential feature of my invention, in order that the steam may sweat or percolate through it from the tank, B, and so that the tobacco will not be tainted by contact with metal. The vessel, C, is enough smaller than the tank, B, to be suspended in the latter, and leave an annular space, b, between the two, as well as a space underneath the bottom of the vessel, C, as shown."

It is obvious that this inventor meant to have the tobacco holder, as he calls the box, C, sufficiently open, either through the pores of the wood, or interstices between the staves or boards, so that steam would slowly percolate through, and not that a strong jet of steam should pass through any one crevice or opening, so as to be condensed on the tobacco and wet it, but that it should slowly percolate through the pores of the wood, and maintain a steady, low degree of warmth inside the holder, and upon the leaves. This was the evident purpose of the inventor in the device which he has presented. It is true the inventor, in his claim, says:

"I claim—*First,* the apparatus substantially as described for treating tobacco, to-wit: the tight vessel or tank, B, *the tight vessel, C, made of wood,* and suspended in the tank, B, and a steam generator or heater, all combined and operated together, substantially as and for the purposes specified; *second,* the combination of the boiler, A, the tight tank, B, made of wood, *the tight vessel, C, made of wood,* and suspended in the tank, B, and the pipes, D and E, entering the tank, B, and the boiler, all arranged and operating substantially as and for the purposes specified."

The "tight vessel, C," as described and referred to in the claims, must mean the "tight vessel, C," described in the specifications, and

no other; and that means, simply, one comparatively or approximately tight—one tight enough to exclude a large jet of steam, and at the same time open enough to admit the percolation of steam through it.

It is obvious that what this inventor wished to accomplish was to moisten his tobacco without wetting it. Now, literally, a thing which is moist may be said to be wet; but there is, after all, a practical difference between wet tobacco and moist tobacco, which is of great consequence in the manufacture of this commodity, and to the success of this process, and complainant intended by his mechanism to obtain, by means of his porous tobacco holder, just that degree of warmth and moisture which would cause the resweating of the leaves, so as to secure an equal distribution of the coloring matter, and perhaps of the essential oil of the tobacco, through the whole contents of the mass subjected to the process, so as to make it nearly homogeneous in color and quality. If, therefore, it was the intention of complainant, and a necessary part of his device, that the tobacco holder should be open or porous enough to admit moisture, I do not think defendant can be allowed to infringe by using a tobacco holder a little more porous or open. The essential feature of complainant's invention consists in subjecting the mass of leaf tobacco to moisture and heat in a comparatively close wooden box for a sufficient time to have it undergo the process of resweating; and it is no answer to complainant's charge of infringement of his patent to say that defendant's box is not quite so tight as that complainant deems desirable or necessary for the most satisfactory operation of his device.

I conclude, then, that the defendant's device, in its mode of construction and operation, manifestly infringes the complainant's patent.

The next and last question to be considered is as to the novelty of complainant's device. Two devices for steaming tobacco are shown in the proof—one, the Oppelt patent of June 16, 1874; and the other, the Wenderoth patent of 1878. An examination of these mechanisms shows them both to be literally tobacco steamers. They consist of metal tanks, and within a metal tobacco holder, into which the steam was to be directly admitted; and the proof shows that they do not produce the result secured by the complainant's invention. Contact with the metal taints and injures the tobacco operated upon, and the free admission of steam wets, and, to some extent, cooks the tobacco. The porous wooden tobacco holder devised by Robinson seems, from the proof, to stimulate that slow fermentation and action in the constituent elements of the leaf which is required to make the

whole mass homogeneous; and it would seem that this cannot be done with either the Oppelt or Wenderoth devices.

I therefore conclude that there is no proof in this case which should be allowed to defeat this patent for want of novelty. There will be an order for the injunction as prayed, and reference to the master to assess damages.